*IN THE UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF MARYLAND*

| | | |
|---|---|---|
| **LEON COURSEY** | * | |
| *Plaintiff* | * | **Civil Action No.: CCB 11-cv-1957** |
| **v.** | * | |
| **UNIVERSITY OF MARYLAND EASTERN SHORE, et al.** | * | |
| | * | |
| *Defendants* | | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Leon Coursey, Ph.D. ("Dr. Coursey"), through counsel and pursuant to Local

Rule 105 files this Memorandum of Law.

## INTRODUCTION

Dr. Coursey filed this suit against his former employer, University of Maryland Eastern

Shore ("UMES" or "University"), and the State of Maryland.  UMES is a public, four-year

college and is a member of the University System of Maryland.  Dr. Coursey asserts claims

against Defendants under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act

of 1973 ("Rehabilitation Act"), the Due Process Clause of the Fourteenth Amendment pursuant

to 42 U.S.C. § 1983 and the common law of Maryland.  UMES filed an Answer to Dr. Coursey's

Complaint and now moves for Summary Judgment.

## STATEMENT OF FACTS

Dr. Coursey was hired by UMES in 1972 as an Assistant Professor. *Exhibit 1, p. 2.*

During his 38 year tenure with UMES, Dr. Coursey soared through the academic ranks, first

becoming an Associate Professor in 1973, and eventually a fulltime, tenured Professor in 2001.

*Id.* Until his removal from the classroom in February 2009, Dr. Coursey continued at the

forefront of faculty activities on campus, serving on enumerable committees and representing the University in joint ventures with Salisbury University. *Exhibit 2.* While employed by UMES, Dr. Coursey also served in a number of supervisory positions, including Dean of the School of Professional Studies, Chair of the Department of Physical Education and Director of the Department of Athletics. *Id.*

On February 3, 2009, a uniformed security guard appeared in Dr. Coursey's office and presented him with written correspondence identifying that Dr. Coursey had been placed on administrative leave. *Exhibit 3.* Pursuant to this correspondence, Dr. Coursey was removed from all classes and prohibited from entering campus. *Id.* Dr. Coursey was also physically escorted from the University by campus security, and directed that he was to have no contact with his students until further notice. *Id.* Prior to his February 3, 2009 removal, Dr. Coursey was unaware of any allegations of misconduct or complaints regarding his teaching. *Exhibit 4.* Dr. Coursey thereafter filed a timely grievance challenging his removal and the allegations contained in the February 3, 2009 correspondence. *Id.*

In response to Dr. Coursey's grievance, a hearing was conducted by the UMES Faculty Grievance Hearing Board ("Grievance Board") on May 14, 2009. *Exhibit 5.* During the hearing, testimony of 18 witnesses was presented, including that of Dr. Coursey and several of his students. *Id. at page 2.* Both parties made opening and closing statements. *Id.* Prior to the hearing, Nicholas Blanchard, Ph.D. ("Dr. Blanchard") was charged with conducting an investigation into the alleged complaints necessitating Dr. Coursey's removal. *Exhibit 6.* Dr. Blanchard reduced the alleged complaints to three categories:  arbitrary and capricious grading; inappropriate behavior in the classroom; inappropriate behavior outside of the classroom. *Id.* The testimony and arguments advanced by UMES during the hearing centered on Dr. Coursey's

teaching style, classroom methodologies, and relationships with students and colleagues. *See generally, Exhibit 5.* After deliberations, the Grievance Board voted unanimously that Dr. Coursey was improperly removed from the University and recommended that Dr. Coursey be allowed to return to his regular teaching duties. *Exhibit 5, p. 2.* The Grievance Board also determined that, to the extent UMES received complaints from students regarding Dr. Coursey's grading, the students should be informed of their right to initiate action under the University's policies and procedures regarding arbitrary and capricious grading. *Id.* At the time of the hearing before the Grievance Board, there were no pending complaints against Dr. Coursey pursuant to the UMES policies regarding arbitrary and capricious grading. *Id.*

Under the University of Maryland System Policy, the Grievance Board's recommendation was to be acted upon by then President Dr. Thelma Thompson ("President Thompson") within thirty days. *Exhibit 7.* On June 4, 2009, President Thompson issued correspondence identifying that "in accordance with [the Grievance Board's] recommendation, I am requesting…Dr. Coursey to have a medical and/or mental health evaluation." *Exhibit 8.* In response, the Chair of the Grievance Board, Robert B. Dadson ("Dr. Dadson"), directed correspondence to President Thompson identifying that he received President Thompson's letter identifying that she was "accepting the Board's recommendation to have Dr. Coursey evaluated for fitness for duty by medical/psychological professions." *Exhibit 9.* Dr. Dadson's correspondence, however, goes on to state that "I wish to humbly apprise you that the Board did not make any such recommendation for fitness of duty by medical/ psychological professional." *Id.*

Despite the clarification from the Chair of the Grievance Board that no recommendation was made for Dr. Coursey to undergo a fitness for duty examination, President Thompson

persisted that Dr. Coursey submit to the examination. *EXHIBIT 10.*  Dr. Coursey, who was aware the Committee had not recommended a fitness for duty evaluation, and who was not mentally ill, declined to undergo a fitness for duty evaluation and filed a complaint under the Americans with Disabilities Act with the Equal Employment Opportunity Commission ("EEOC").  *EXHIBIT 11.* Dr. Coursey's EEOC Charge of Discrimination asserted that the University was penalizing him because of a bogus perception that he was disabled. *Id.*

On May 26, 2010 UMES issued "Charges for Termination" of Dr. Coursey's tenured employment with the University.  *Exhibit 12.* The grounds for terminating Dr. Coursey mirrored those on which his February 3, 2009 removal was predicated.  In support of Plaintiff's termination, UMES now categorized the student grade complaints as "incompetence," and deemed the interactions with colleagues to be "professional misconduct."  *Id.* The sole exception is that the Charges for Termination also alleged that Dr. Coursey was insubordinate by refusing to participate in the fitness for duty evaluation. *Id.*

Dr. Coursey appealed his termination and a second Faculty Grievance Hearing Board ("Termination Board") was convened. *Exhibit 13.* Prior to the presentation of evidence before the Termination Board, Dr. Coursey's legal counsel noted that all allegations regarding the charges of professional misconduct and incompetence where already decided upon by the Grievance Board and should be excluded from the termination proceedings. *Exhibit 14.*  Dr. Coursey, through counsel, also objected to the presentation of evidence regarding his alleged insubordination, on the basis that insubordination is not a terminable offense under the policies of the Board of Regents. *Id.*

Over Plaintiff's objection, the Termination Board went forward with the proceedings. The hearing before the Termination Board was analogous to that conducted by the prior

4

Grievance Board, and included many of the same witnesses and exhibits. For example, in support of the incompetence charge, student grade complaints and evidence of Dr. Coursey's dislike for computerized teaching aids was presented; in support of the professional misconduct charge, rumors and accusations of sexual harassment and disputes with coworkers; in support of the insubordination charge, evidence of Dr. Coursey's refusal to submit to a fitness for duty evaluation. *Exhibit 13.* Counsel for UMES also entered into evidence copies of Dr. Coursey's EEOC filing, and informed the Board that the EEOC proceeding was going forward due to Dr. Coursey's failure to agree to a settlement. *Exhibit 15.* In the wake of this presentation, Dr. Coursey amended his EEOC filing to add charges that the University was retaliating against him for filing his initial EEOC complaint. *Exhibit 16.*

Ultimately, the Termination Board issued a report recommending the termination of Dr. Coursey on the grounds of insubordination, incompetence and professional misconduct. *Exhibit 13.* Thereafter, oral arguments were conducted before President Thompson who issued correspondence adopting their recommendation and officially terminating Dr. Coursey. In her termination letter dated December 17, 2010, President Thompson, for the first time, addressed the recommendation of the prior Grievance Board and held that she was rejecting the Grievance Board's recommendation to reinstate Dr. Coursey, and accepting the Termination Board's recommendation to terminate him. *Exhibit 17.* Dr. Coursey appealed his termination to the University System of Maryland Board of Regents. Oral argument was held before the Board of Regents on May 27, 2010 and a decision was issued on June 21, 2011 upholding Dr. Coursey's termination. *Exhibit 1.*

**<u>STANDARD OF REVIEW</u>**

Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).   The Court views the evidence in a light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).   Summary judgment is particularly inappropriate where the primary issue is one of discriminatory or retaliatory intent and motive.  *Hardin v. Pitney-Bowes Inc.*, 451 U.S. 1008, 1008 (1981).  Federal Rule of Civil Procedure 56 should be cautiously invoked so that the parties may always be afforded a trial where there is a *bone fide* dispute of fact.  *Associated Press v. United States*, 326 U.S. 1 (1945).  A summary judgment motion will be granted only if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## LEGAL ARGUMENT

**I.**     **BY DEMANDING THAT DR. COURSEY SUBMIT TO AN UNLAWFUL FITNESS FOR DUTY EXAMINATION, UMES VIOLATED THE AMERICANS WITH DISABILITIES ACT.**

Dr. Coursey alleges that UMES violated the Americans with Disabilities Act in three separate and distinct ways. The first violation stems from Defendant's demand that Dr. Coursey submit to an unlawful fitness for duty evaluation. *See*, *Malone v. Greenville County,* 2008 WL 4557498 (20008)(identifying that a claim under the ADA for an improper medical examination is separate and distinct from a claim of discrimination). The ADA provides that an employer is prohibited from requiring a medical examination or making inquiries of an employee as to whether he is an "individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business

necessity." *Porter v. U.S. Alumoweld Co., Inc.,* 125 F.3d 243, 246 (4th Cir. 1997).  Specifically,

42 U.S.C.A. § 12112 (d)(4)(A) provides that "a covered entity shall not require a medical

examination and shall not make inquiries of an employee as to whether such employee is an

individual with a disability or as to the nature or severity of the disability, unless such

examination or inquiry is shown to be job-related and consistent with business necessity."

 Count I of Dr. Coursey's Amended Complaint alleges that UMES violated 42 U.S.C.A. §

12112 (d)(4)(A) by demanding that he submit to an unlawful fitness for duty evaluation, and then

firing him when he refused to participate. In discussing the Americans with Disabilities Act, the

Fourth Circuit noted that employers may "make inquiries or require medical examinations

(fitness for duty exams) when there is a need to determine whether an employee is still able to

perform the essential functions of his or her job." *Porter,* at 246*. (quoting* 29 C.F.R. Part 1630,

App. § 1630.14(c)).  For example, an employer's request for a fitness for duty exam after an on-

the-job injury is clearly job-related and meets a business necessity.  *Id.*  The United States

District Court for the District of Maryland in *Kim v. MedImmune, Inc.*  2004 WL 3313219, 2 (D.

Md. 2004)(quoting EEOC Enforcement Guidance) provided the following method for

determining legality under the ADA:

> An inquiry regarding disability or a medical examination of an employee may
> be "job related and consistent with business necessity," within the meaning of
> the ADA, when the employer has a reasonable belief based on objective
> evidence that:
>
> > (1) an employee's ability to perform essential job functions will be
> > impaired by a medical condition or
> >
> > (2) an employee will pose a direct threat due to a medical condition.

 The *Kim* Court also identified that the employer's reasonable belief "must be based on

objective evidence, obtained or reasonably available to the employer, ***prior to*** making a disability

related inquiry or requiring a medical examination. Such belief requires an assessment of the employee and his/her position and cannot be based on general assumption." *Id (citations omitted)(emphasis added).*

The procedural posture leading up to Defendant's request for a fitness for duty examination makes certain that the University's directive was neither job related nor consistent with a business necessity.  When President Thompson made her initial request that Dr. Coursey undergo a "medical evaluation and/or mental health evaluation," she identified that she was doing so based on the recommendation of the Grievance Board.  *Exhibit 8.* This was obviously a faulty basis, as Dr. Dadson confirmed that the Grievance Board made no such recommendation. *Exhibit 9.*  It is beyond logic that Present Thompson's request was motivated by anything other than the Grievance Board's alleged recommendation, because her request came four months after Dr. Coursey was removed from the classroom.  Had there been a legitimate concern regarding Dr. Coursey's ability to perform his job or the safety of others, the University should have requested the fitness for duty examination contemporaneously with his removal.

The unreasonableness of Defendant's request is also shown in the lack of specificity in the type of exam requested. For an examination to be "job-related" and "consistent with business necessity," it must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue. *Tice v. Centre Area Transp. Authority,* 247 F.3d 506 (3rd Cir. 2001) *(citations omitted).* Here, President Thompson broadly requested that Dr. Coursey participate in a "medical evaluation and/or mental health evaluation." *Exhibit 8.* At no point did UMES clarify the precise nature of the requested fitness for duty examination, or even whether the examination would involve Dr. Coursey's medical *or* mental health.

While Defendant's Motion for Summary Judgment does not specifically address Dr. Coursey's claim that the requested fitness for duty examination was unlawful, UMES generally attempts to justify its request by citing to conclusory allegations that Dr. Coursey was acting erratically and presented a danger to the workplace.  This approach, however, ignores that fact the after conducting a full hearing regarding Dr. Coursey's removal from the classroom, the Grievance Board recommended that Dr. Coursey be reinstated.  Moreover, given that President Thompson's June 4, 2009 correspondence cites that the request was based on her false belief that the Grievance Board recommended the examination, any allegations regarding Dr. Coursey's conduct are merely afterthoughts.

Thus, the request that Dr. Coursey submit to a fitness for duty examination was neither job related nor consistent with business necessity for the following reasons: (1) the request came four months after Dr. Coursey was removed from his teaching positions; (2) the request was based solely on a faulty belief that the Grievance Board recommended the examination; and (3) the broad request that Dr. Coursey under go a "medical evaluation and/or mental health evaluation" was not limited in scope to support an objective belief that he could not perform the essential functions of his job.  The Americans with Disabilities Act strictly prohibits employers from conducting fishing expeditions into whether an employee has a disability. Accordingly, Defendant's request that Dr. Coursey's first count under the ADA be dismissed must be denied.

II.     **DR. COURSEY HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION UNDER BOTH THE AMERICANS WITH DISABILITIES ACT, AS WELL AS THE REHABILITATION ACT OF 1973.**

Dr. Coursey's second claim under the Americans with Disabilities Act asserts that UMES discriminated against him by removing him from the classroom, requesting that he undergo a fitness for duty examination, and ultimately terminating him as a result of a bogus perception

that he is disabled.  Title I of the ADA prohibits discriminatory discharge of "a qualified individual with a disability because of the disability." *Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 246 (4th Cir. 1997).  Specifically, 42 U.S.C.A. § 12112 (a) provides that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

In order to establish a *prima facie* case under Title 1 of the ADA, Dr. Cousey must show the following: (1) he was in the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir. 1995). UMES alleges that Dr. Coursey cannot  establish a *prima facie* case with respect to the first, third and fourth element of this test.  Similarly, under the Rehabilitation Act, Dr. Coursey must show the following:  (1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability.  *Lassiter v. Reno*, 86 F.3d 1151 (4th Cir. 1996).  Although the wording is slightly different, "the ADA and Rehabilitation Act generally are construed to impose the same requirement" and the same analysis is applied to both."  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).

### A.    Defendant Regarded Dr. Coursey As Being Disabled.

While Dr. Coursey does not allege that he is actually disabled, he does assert that he is a member of the class protected by the ADA and the Rehabilitation Act because his employer regarded him as disabled.  Under the ADA, a person is disabled if he meets any of three criteria:

10

1) a physical or mental impairment that substantially limits one or more of the major life activities; 2) a record of such an impairment; or 3) being regarded as having such an impairment[1]. 42 U.S.C.A. § 12102(2). Under the "regarded as" criterion of the ADA, the plaintiff must show that either (1) his employer mistakenly believed that he had a physical impairment that substantially limited one or more major life activities, or (2) the employer mistakenly believed that an actual, non-limiting impairment substantially limited one or more major life activities of the plaintiff. *Hodgson v. Shenandoah's Pride Dairy*, 2002 WL 923926 (W.D. Va.) *aff'd,* 42 F. App'x 594 (4th Cir. 2002).

There is sufficient evidence in this matter to establish that UMES regarded Dr. Coursey as possessing a physical and/or mental impairment that substantially limited one or more major life activities. Contrary to Defendant's assertion, a request for a fitness for duty examination may, "taken in conjunction with other evidence or circumstances surrounding the request, establish that the employer regarded the employee as disabled. *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 516 (3rd Cir. 2001). The *Tice* Court explained that if an employer's examination is "not limited to an assessment of those potential impairments that had occasioned the examination in the first place, but instead became a wide-ranging assessment of mental or physical debilitation, such evidence might be highly probative as to the nature of the employer's perception." *Id. (citations omitted).* "Further, a request for an examination, taken in conjunction with evidence suggesting that the employer had no reasonable basis for harboring doubts about the employee's ability to do his or her job in the first place, might also be probative as to the nature of the employer's regard." *Id*

---

[1] Under the Rehabilitation Act, an individual with a disability is defined as a person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C.A. § 706(8)(b)

As shown above, Defendant's request that Dr. Coursey submit to a fitness for duty evaluation was neither job related nor consistent with a business necessity.  President Thompson's demand that Dr. Coursey submit to a "medical evaluation and/or mental health evaluation" is just the wide-ranging assessment of mental or physical debilitation that the *Tice* Court confirmed is prohibited under the ADA. The fact that Dr. Coursey was physically removed from campus by University police – an action much too dramatic of the occasion - further bolster's his allegation that UMES officials regarded him as disabled.  *Exhibit 5, p. 18.* Moreover, it is clear from the general tenor of Defendant's Motion that UMES based its request that Dr. Coursey submit to a fitness duty examination in order to determine the extent of a perceived disability.  Thus, Dr. Coursey has presented sufficient evidence that his employer regarded him as disabled.  At the very least, Dr. Coursey has raised a genuine issue of fact as to whether UMES' regarded him as possessing a disability under the ADA and the Rehabilitation Act.

### B. At The Time Of His Termination, Dr. Coursey's Job Performance Was More Than Satisfactory.

UMES next alleges that Dr. Coursey cannot establish a *prima facie* case of discrimination under the Americans with Disabilities Act or the Rehabilitation Act because he was not meeting his employer's legitimate expectations. In support of this assertion, UMES alleges that Dr. Coursey was reprimanded for sexual harassment and was the subject of complaints issues by colleagues and students.  UMES fails to mention, however, that the sexual harassment investigation occurred in 2004-2005, almost five years prior to Dr. Coursey's termination, and that the Grievance Board determined that the sexual harassment case was not relevant to Dr. Coursey's 2009 removal.  *Exhibit 5.* Moreover, UMES fails to cite to an actual finding of sexual harassment, as one does not exist.  With respect to Defendant's allegations of poor performance,

even the Termination Board identified that Dr. Coursey's personnel file contained "limited records of reprimand, chair evaluations, self evaluations, and student evaluations completed over the course of Dr. Coursey's thirty-eight year tenure at UMES." *Exhibit 13, p. 3.* In fact, during the proceeding before the Termination Board, UMES was only able to cite to two reprimands issued to Dr. Coursey during his 38 year career. *Id.*

The most probative evidence of Dr. Coursey's sufficient job performance is the fact that the Grievance Board voted unanimously to reinstate him. *Exhibit 5.* At that hearing, the Grievance Board was presented with the same evidence UMES now cites in support of its allegation that Dr. Coursey's job performance was unsatisfactory. Specifically UMES presented the Grievance Board will allegations that Dr. Coursey disliked computerized teaching techniques, failed to grade assignments and was cantankerous in his dealing with colleagues. *See generally Exhibit 5.* Despite this, the Grievance Board determined that Dr. Coursey should be reinstated. Accordingly, at a minimum, there is a genuine dispute of fact as to whether Dr. Coursey's job performance met his employer's expectations at the time of his removal.

### c.       **The Facts Of This Case Support An Inference That UMES Discriminated Against Dr. Coursey Because Of His Perceived Disability.**

UMES also alleges that Dr. Coursey cannot show that his termination supports an inference of discrimination. An inference of discrimination arises where there is some evidence of a causal connection between a plaintiff's disability and the adverse employment action taken against the plaintiff. *Allen v. Interior Const. Services, Ltd.,* 214 F.3d 978, 982 (8th Cir. 2000). In doing so, "any credible evidence tending to establish that an employer acted adversely to an individual on account of his disability will suffice. *Id. (citations omitted).*

The same evidence used to show that Dr. Coursey was regarded as disabled is germane to the determination of whether he was discriminated against. *E.E.O.C. v. Town & Country Toyota,*

*Inc.,* 7 F. App'x 226 (4th Cir. 2001). Here, UMES clearly regarded Dr. Coursey as disabled, and

demanded that he submit to a fitness for duty evaluation in order to determine the nature and

extent of the perceived disability. Defendant cannot reasonably deny that UMES officials

regarded Dr. Coursey as disabled, as Defendant had University police physically escort Dr.

Coursey from campus. *Exhibit 5, p. 18.* Moreover, the general tenor of Defendant's instant

Motion suggests that the University perceived Dr. Coursey as possessing a disability which

necessitated his removal (*see* Defendant's Motion at page 16-17 wherein Defendant refers to Dr.

Coursey as "unstable" and that he "went berserk").

Defendant's claim that Dr. Coursey was not terminated because of his perceived

disability also ignores the indisputable fact that after the Grievance Board determined that Dr.

Coursey should be reinstated, the University convened a second Board to review the same

evidence and terminate Dr. Coursey. A reasonable finder of fact could infer that Dr. Coursey's

termination was based on Defendant's bogus perception that he possessed a disability and in

order to effectuate his termination on this basis, convened a second Board to review Dr.

Coursey's performance.   Thus, at the very least, there is a dispute of fact regarding whether the

termination of Dr. Coursey was causally connected to his perceived disability.

### III.   DR. COURSEY HAS ESTABLISHED A *PRIMA FACIE* CASE OF RETALIATION OR, AT THE VERY LEAST, HAS GENERATED A GENUINE DISPUTE OF FACT ON THE ISSUE.

Dr. Coursey's final claim under the ADA is based on an allegation that UMES retaliated

against him for filing a complaint with the EEOC.  In order to establish a *prima facie* case of

retaliation, a plaintiff must allege (1) that he has engaged in conduct protected by the ADA; (2)

that he suffered an adverse action subsequent to engaging in the protected conduct; and (3) that

there was a causal link between the protected activity and the adverse action. *Freilich v. Upper*

*Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002); *Rhoads v. FDIC,* 257 F.3d 373, 392 (4th Cir.2001). Defendant's sole challenge to Dr. Coursey's claim of retaliation is that too much time elapsed between Dr. Coursey's protected activity and the adverse employment action. UMES concedes that Dr. Coursey both engaged in a protected activity and suffered an adverse employment action.

Dr. Coursey was removed from the classroom on February 3, 2009 and was directed to undergo a fitness for duty evaluation on June 4, 2009. *Exhibit 3 and Exhibit 8.* Thereafter, Dr. Coursey filed a Charge of Discrimination with the EEOC on or about October 28, 2009, and later amended his Charge in November 2010. *Exhibits 11 & 16.* The parties unsuccessfully participated in mediation before the EEOC on February 17, 2010. *Exhibits 15 & 18.* While Dr. Coursey was continuously barred from entering campus after his February 3, 2009 removal, he did not receive official notification of his termination until May 26, 2010. *Exhibit 12.* As a result, Dr. Coursey's official termination came seven months after he filed his Charge of Discrimination and only three months after the parties' failed mediation.

Principally, it must be noted that temporal proximity alone cannot be used to justify a lack of causal connection between a protected complaint and an adverse employment action. For instance, the Fourth Circuit has determined that "in cases where 'temporal proximity between a protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007)(*citing Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000)). "Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Id.*

The Plaintiff in *Lettieri* did not rely on temporal proximity to establish causation.  Rather the Plaintiff in that case "pointed to continuing retaliatory conduct and animus directed at her by [Defendant] in the seven-month period between her complaint and her termination." During this seven-month period, Lettieri was denied a job transfer and stripped of significant employment responsibilities. The Fourth Circuit determined that "these intervening events-which occurred regularly after Lettieri's complaint and can reasonably be viewed as exhibiting retaliatory animus on the part of [Defendant]-are sufficient to show a causal link between Lettieri's complaint and her termination." The Fourth Circuit therefore held that despite the seven-month delay between Lettieri's complaint and her termination, Lettieri established a *prima facie* case of retaliation. *Id.* at 51.

Here, at all times between Dr. Coursey's EEOC Charge of Discrimination and the notice of termination, Dr. Coursey remained barred from campus and was prohibited from conducting himself as a professor.  While Dr. Coursey's actual termination did not arrive until seven months after his EEOC complaint, UMES continued to punish Dr. Coursey in the months leading up to his termination by refusing to lift the academic probation and demanding that he participate in a fitness for duty evaluation.  Moreover, Dr. Coursey's termination came only three months after the parties failed to reach an agreement through the EEOC mediation process, further bolstering the claim that Dr. Coursey's termination was linked to his EEOC Complaint.

Dr. Coursey presents additional evidence depicting the link between his EEOC Complaint and his termination.  Most compelling is the fact that UMES submitted Dr. Coursey's EEOC Complaint into evidence at his termination hearing.  Further, UMES presented testimony of the parties' failed attempt to mediate Dr. Coursey's Complaint through the EEOC. *Exhibit 15.* If UMES did not intend to rely upon Dr. Coursey EEOC's Complaint as a basis for his

termination, there would be no reason to submit his Complaint into evidence at his termination proceeding.  Accordingly, the facts leadings up to and surrounding Dr. Coursey's termination support a causal link between his protected complaint and his termination.

### IV.   DEFENDANT'S PROFFERED LEGITIMATE, NON-RETALIATORY REASONS FOR TERMINATING DR. COURSEY ARE PRETEXTUAL.

Once an employee establishes a *prima facie* case of retaliation under the ADA, "the employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001)(*internal citations omitted*).  Once a Defendant offers a legitimate, nondiscriminatory reason for their termination of a Plaintiff, "the Plaintiff must than have an opportunity to prove... that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for" retaliation. *Campbell v. Prince George's County Maryland*, 2001 WL 706039 (D. Md.). Dr. Coursey can show pretext by demonstrating that UMES' explanation is "unworthy of credence" or by "offer[ing] other forms of circumstantial evidence sufficiently probative of intentional discrimination."  *Dugan v. Albemarle County Sch. Bd.,* 293 F.3d 716, 721 (4th Cir. 2002).

Given that the only challenge advanced by UMES to Dr. Coursey's claim of retaliation is an unpersuasive argument that too much time elapsed between his complaint and his termination, Dr. Coursey presents a strong case of retaliation.  In response, UMES alleges that Dr. Coursey cannot succeed on his claim of retaliation under the ADA because UMES possessed a legitimate, nondiscriminatory reason for his termination. Specifically, UMES alleges that Dr. Coursey was terminated for incompetence, professional misconduct and insubordination.

To establish a fact issue on pretext, a plaintiff must present evidence that: (1) creates a factual dispute as to whether the employer's proffered reasons for taking adverse employment action are pretextual; and (2) allows a reasonable jury to infer that the employer's action was

motivated by a discriminatory animus. *Allen v. Interior Const. Services, Ltd.*, 214 F.3d 978, 983 (8th Cir. 2000). Here, two separate Boards reviewed Dr. Coursey's job performance. The Grievance Board determined that Dr. Coursey should be reinstated, while the Termination Board determined that Dr. Coursey should be terminated. Given that the evidence presented to the Boards was substantially similar, at the very least, a factual dispute exists as to whether the University had grounds to terminate Dr. Coursey. Moreover, Defendant's reliance on the ground of subordination is misplaced, as a tenured professor cannot be terminated for mere insubordination. *Exhibit 19.*  According, the University's reasons for terminating Dr. Coursey are unworthy of credence, because the Grievance Board determined that Dr. Coursey should be reinstated, and any reliance on alleged insubordination is misplaced.

### V.      UMES INFRINGED UPON DR. COURSEY'S RIGHT OF PROCEDURAL DUE PROCESS BY SUBJECTING HIM TO MULTIPLE APPEAL BOARDS.

Defendant correctly notes that tenure confers upon university professors a property interest in continued employment.  *Regents v. Roth,* 408 U.S. 564 (1972).  The Fourteenth Amendment of the United States Constitution provides that state actors shall not deprive any person of life, liberty, or property without due process of law. *U.S. Const. Amend. XIV.* "In order to state a claim for relief for a violation of procedural due process, a plaintiff must establish (1) that he was deprived of a protected property or liberty interest; and (2) that the procedures provided were inadequate." *Lanier Const. Co., Inc. v. City of Clinton, N.C.*, 812 F. Supp. 2d 696, 699 (E.D.N.C. 2011); *Regents v. Roth,* 408 U.S. 564 at 33. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Bogart v. Chapell*, 396 F.3d 548, 556 (4th Cir. 2005)(*citations omitted*).

18

UMES alleges that Dr. Coursey cannot succeed on his due process claim because he was provided a meaningful hearing before the Termination Board. To support of this assertion, Defendant points to the quantity of evidence presented to the Termination Board, as well as the number of hours dedicated to this hearing.  Dr. Coursey does not dispute that a great quantity of evidence was presented to the Termination Board or that 47.5 hours were dedicated to his hearing.  Rather, Dr. Coursey's due process claim rests on the fact that the University subjected him to multiple hearings regarding the same events.

When Dr. Coursey was placed on academic probation in February 2009, the Grievance Board was convened in order to review the propriety of the University's actions.  By the University's own admission, Dr. Coursey's removal was based on complaints of arbitrary and capricious grading; inappropriate behavior in the classroom; inappropriate behavior outside of the classroom. *Exhibit 6.* At the conclusion of this hearing, the Grievance Board recommended to President Thompson that Dr. Coursey be reinstated. Although UMES policy required President Thompson to act on the Grievance Board's recommendation within 30 days, the President failed to do so.  *Exhibit 7.*  Rather, President Thompson took no action with the respect to the Grievance Board's recommendation and convened the Termination Board to again review the evidence.  The issues presented to the Grievance Board and the Termination Board were identical and focused solely on the actions of Dr. Coursey prior to his February 3, 2009 removal. In fact, because Dr. Coursey remained continuously barred from campus from February 3, 2009 until well after the conclusion of the Termination Board's proceedings, it is impossible for new evidence regarding Dr. Coursey's teaching to have been generated in the intervening period.

Dr. Coursey had a fundamental right to a meaningful hearing.  *Bogart v. Chapell*, 396 F.3d 548, 556 (4th Cir. 2005)(*citations omitted*).  Despite the obvious similarities between the

hearings, the Termination Board recommended Dr. Coursey be terminated.  Thereafter, President

Thompson notified Dr. Coursey that she had accepted the recommendation of the Termination

Board and rejected that of the Grievance Board.   While UMES alleges that the proceedings

before the two Boards differed, the only issue presented to the Termination Board not previously

evaluated by the Grievance Board was the charge of insubordination.  However, pursuant to

UMES and State policy, insubordination is not a basis for termination of a tenured professor.

*Exhibit 19.*  UMES' failure to adequately present its case during the first hearing does not justify

assembling a second board to review additional evidence on the same issues. Presenting

duplicative evidence to the Termination Board negated the effect of the prior hearing and

deprived Dr. Coursey of his right to a meaningful hearing.

Defendant's final challenge to Dr. Coursey's due process claim is that Dr. Coursey

waived this argument by failing to raise it during the internal administrative proceeding.

Defendant's argument fails because Dr. Coursey did raise this argument to the Termination

Board when, through counsel, he objected to the presentation of evidence relating to the charges

of professional misconduct and incompetence on the basis that they were already decided upon

by the Grievance Board. *Exhibit 14.* Dr. Coursey, through counsel, also objected to the

presentation of evidence regarding his alleged insubordination, on the basis that insubordination

is not a terminable offense under the policies of the Board of Regents. *Id.*  Thus, assuming

*arguendo* that Dr. Coursey had an obligation to raise this issue before the Board, this obligation

was met.

## VI.   UMES IS NOT IMMUNE FROM DR. COURSEY'S BREACH OF CONTRACT CLAIM.

UMES also alleges that if this Court grants summary judgment on Dr. Coursey's federal

causes of action, this matter should be dismissed because UMES is immune from suit in Federal

20

Court for breach of contract actions.   As noted by Defendant, Dr. Coursey properly included his breach of contract claim in this federal litigation because 28 U.S.C.A. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  The arguments presented by Defendant's Motion for Summary Judgment do not substantially challenge the federally based claims asserted by Dr. Coursey and certainly do not warrant dismissal of his case.  Thus, to the extent Dr. Coursey survives summary judgment on at least one count, this Court may properly consider his breach of contract action.   Even if this Court were to dismiss Dr. Coursey's federally based claims, it is within the Court's discretion to continue its supplemental jurisdiction over the state law claim. 28 U.S.C.A. § 1367(c).  Here, it is in the best interest of judicial economy for this Court to retain jurisdiction over the breach of contract claim.  Finally, even if the Court were to decline further jurisdiction over Dr. Coursey's breach of contract claim, under 28 U.S.C.A. § 1367(d) any limitations period would be tolled and this matter could then be brought in State Court.

### VII.   UMES BREACHED ITS CONTRACTUAL OBLIGATIONS OWED TO DR. COURSEY.

Defendant's final argument is that UMES did not breach the provisions of Dr. Coursey's employment contract.  UMES does not dispute that Dr. Coursey's employment with UMES was contractual in nature or that the parties were bound by the provisions found in the University System of Maryland ("USM") policies[2].  Pursuant to the USM policies, a tenured faculty

---

[2] While not disputed by Defendant, the relevant case law identifies that UMES was contractually bound to the provisions contained in the University System of Maryland polices. *Staggs v. Blue Cross of Maryland, Inc*., 61 Md.App. 381 (1985)("policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, if properly expressed and

member such as Dr. Coursey can only be terminated for "moral turpitude, professional or scholarly misconduct, incompetence, or willful neglect of duty." *Exhibit 19, p.5.* Here, UMES has indisputably breached this contract by terminating Dr. Coursey for insubordination, as insubordination is not a terminable offense. Moreover, Dr. Coursey contends that based on the Grievance Board's determination to reinstate his position, insufficient evidence existed to terminate him for incompetence or professional misconduct. Finally, the USM policies also afford Dr. Coursey the contractual right to a meaningful hearing regarding his termination. *Id.* As outlined above, Dr. Coursey's hearing before the Termination Board was anything but meaningful and UMES, as a result, breached the parties' employment contract.

## SUMMARY OF ARGUMENT

To resolve the issues presented before this Court, findings of material facts must be made. Accordingly, under the well-established Rule 56 standard, UMES is not entitled to summary judgment. Moreover, even if this Court were to entertain the merits of Defendant's Motion, viewing the facts in a light most favorable to Plaintiff, Dr. Coursey has presented evidence of a *prima facie* case of all three of his claims under the ADA, in addition to violations of the Rehabilitation Act, the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and the common law of Maryland

## CONCLUSION

For the foregoing reasons, UMES is not entitled to summary judgment and, accordingly, this Court should deny its Motion.

communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee.")

_____/s/_____
ROBIN R. COCKEY, Federal Bar No. 02657
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax:  410-546-1811
rrcesq@cbmlawfirm.com