# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LEON COURSEY | : | |
| | : | |
| v. | : | Civil No. CCB-11-1957 |
| | : | |
| UNIVERSITY OF MARYLAND EASTERN SHORE | : | |

## MEMORANDUM

Now pending before the court is a motion for summary judgment filed by the University of Maryland Eastern Shore ("UMES") against plaintiff Leon Coursey ("Dr. Coursey"). Dr. Coursey brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*; the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*; 42 U.S.C. § 1983; and Maryland common law. The issues in this case have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated below, UMES's motion for summary judgment will be granted as to all counts.

## BACKGROUND

Dr. Leon Coursey began working as an Assistant Professor in the Department of Physical Education at UMES in 1972.[1] In 2004, several students reported to the university that Dr. Coursey had sexually harassed them. An investigation by the UMES Director of Human Resources concluded that Dr. Coursey had violated the UMES sexual harassment policy both by harassing students and by retaliating against them after they reported his behavior. (ECF No. 28, Ex. 11.) UMES issued Dr. Coursey a letter of reprimand and required him to attend sexual harassment training. (*Id.*, Exs. 11 & 13.)

---

[1] The department was later renamed the Department of Exercise Science.

1

In 2007, Dr. Coursey began displaying inappropriate behavior toward his colleagues. On several occasions, Dr. Coursey disregarded directives by his supervisor, engaged in unprofessional communication with staff, and ignored university policies regarding travel and class coverage. (ECF No. 28, Exs. 14 & 15; Ex. 4, at 6.) In January 2009, 12 students reported that Dr. Coursey had exhibited erratic behavior in the classroom, including yelling at a student, complaining about students in front of other students whom he perceived to question his grading methods, and telling students that he was the most senior faculty member and "no one [could] touch" him. (*Id.*, Ex. 1, at ¶ 7.) Some students were scared and upset when they reported the incidents. (*Id.*) One student declared that Dr. Coursey "had lost it" and "went berserk." (*Id.*, Ex. 2, at 14.) She stated that Dr. Coursey was "unstable" and she was "scared of him and 'what he might do.'" (*Id.*) Four students submitted written complaints to the Dean of the School of Pharmacy and Health Professions. (*Id.*, Ex. 1, at ¶ 7.) A faculty member also overheard Dr. Coursey yell at students and state, "I am the highest ranking professor on this campus and no one can touch me." (*Id.*, Ex. 2, at 12.) In addition, an adjunct faculty member reported that Dr. Coursey once came up behind her while she was sitting at her computer, put his arms around her, leaned down, and stuck his tongue in her ear.[2] (*Id.*, Ex. 8, at 4.)

Based on this behavior, UMES suspended Dr. Coursey on February 3, 2009, and advised him that he would not be allowed on campus until Dr. Nicholas Blanchard, Dean of the School of Pharmacy and Health Professions, had completed an investigation. UMES states that it was concerned Dr. Coursey posed a direct threat to the safety of students and staff. (ECF No. 28, Ex. 1, at ¶ 8.)

---

[2] Although Dr. Coursey denies this incident occurred, the Faculty Grievance Board found the faculty member to be a credible witness. (ECF No. 28, Ex. 4, at 8; Ex. 8, at 4.)

Dr. Coursey appealed his suspension and removal from the classroom to a UMES Faculty Grievance Board. The sole question before the Board was whether Dr. Coursey had been properly removed from his duties and the classroom. (ECF No. 28, Ex. 10.) Although the Board recommended that Dr. Coursey be allowed to resume his regular duties, the President determined that the Board had used the wrong fitness for duty policy and declined to adopt its recommendations. (*Id.*, Ex. 1, at ¶ 9.) According to the university, the issues were "much broader and more comprehensive" than those addressed by the policy the Board had cited. (*Id.*, Ex. 2, at 4.)

In the meantime, upon completing his investigation, Dr. Blanchard recommended in an internal memorandum that Dr. Coursey not be placed back in the classroom and that he receive a mental health evaluation. (ECF No. 29, Ex. 6.) On June 4, 2009, President Thompson advised Dr. Charles Williams, Vice President for Academic Affairs, to direct Dr. Coursey to undergo a fitness for duty evaluation with a medical provider. (ECF No. 28, Ex. 1, at ¶ 11.) Although UMES communicated this request to Dr. Coursey's counsel and advised Dr. Coursey in writing four times, Dr. Coursey refused. (*Id.* at ¶¶ 9, 11.) UMES Administrators assert that without a fitness evaluation, the risks to campus safety of placing Dr. Coursey back into the classroom were too high. (*Id.* at ¶ 10.) UMES also states that the fitness for duty examination was required under USM/UMES policy. (*Id.* at ¶ 14.)

On October 29, 2009, Dr. Coursey filed a discrimination complaint with the EEOC.[3] On May 25, 2010, Dr. Williams filed charges to have Dr. Coursey terminated for professional misconduct, incompetence, and insubordination. (ECF No. 28, Ex. 2, at 1b-5.) The charges alleged that Dr. Coursey exhibited abusive behavior toward students and colleagues, was

---

[3] The EEOC subsequently issued a statement of no findings, determining that "the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (ECF No. 16, Ex. A.)

deficient in his preparation for class and arbitrary and capricious in his grading methods, and committed substantial errors in advising that resulted in students not being able to matriculate efficiently through the Exercise Science program. (*Id.*) UMES also claimed that Dr. Coursey created a hostile environment and sexually harassed students, engaging in sexually inappropriate banter and comments targeting female students and touching them in inappropriate and objectionable ways. (*Id.*) Finally, UMES alleged that Dr. Coursey was insubordinate based on his refusal to submit to a medical/psychological evaluation. (*Id.*) On May 26, 2010, UMES notified Dr. Coursey by letter that charges for termination had been filed and that he had been relieved of all duties effective immediately. (*Id.* at 1.) Dr. Coursey appealed the charges, and a Faculty Grievance Board of five UMES faculty members was appointed. Between August 26 and September 28, 2010, the Board heard testimony from 19 witnesses and considered 129 exhibits, 10 of which Dr. Coursey presented. (*Id.*, Ex. 1, ¶ 13.) The hearing lasted 47.5 hours over nine non-sequential days. (*Id.*)

On November 4, 2010, the Faculty Grievance Board issued a unanimous decision recommending to President Thompson that Dr. Coursey be terminated. (ECF No. 28, Ex. 4.) The Board found that Dr. Coursey was incompetent in the classroom and engaged in professional misconduct, including insubordination. (*Id.*) Dr. Coursey appealed the recommendation to President Thompson, who upheld the findings on December 17, 2010. (*Id.*, Ex. 5.)

Dr. Coursey appealed President Thompson's decision to terminate him to the University System of Maryland (USM) Board of Regents. An appeal hearing was held before a panel of three regents on May 27, 2011. (ECF No. 28, Ex. 7.) On June 3, 2011, the Board of Regents panel issued its recommendation to the full USM Board affirming Dr. Coursey's termination. (*Id.*) The panel recommended termination for incompetence in teaching and professional

misconduct. (*Id.*) The full Board adopted the panel's recommendation on June 17, 2011, and Dr. Coursey was terminated on June 30, 2011.

On July 18, 2011, Dr. Coursey filed suit in this court against UMES, asserting claims under the ADA and the Rehabilitation Act, the Fourteenth Amendment Due Process Clause pursuant to 42 U.S.C. § 1983, and breach of contract under Maryland common law. After a period of discovery, UMES filed this motion for summary judgment.

## ANALYSIS

**Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)

(alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

**Discussion**

*Wrongful discharge*

Dr. Coursey alleges that UMES terminated him in violation of the ADA and the Rehabilitation Act. Dr. Coursey also claims that UMES violated the ADA by demanding that he submit to a fitness for duty evaluation. To establish a prima facie wrongful discharge claim under the ADA or the Rehabilitation Act, a plaintiff must show that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702-03 (4th Cir. 2001) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995)); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999) (ADA and Rehabilitation Act generally are construed to impose the same requirements due to two acts' similar language). An individual is within the ADA's protected class if he is "a qualified individual with a disability." *Haulbrook*, 252 F.3d at 702 (citing 42 U.S.C. § 12112). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment." *Id.* at 702-03 (citing 42 U.S.C. § 12102(1)). Dr. Coursey does not contend that he was actually disabled at the time of his termination; instead he maintains only that he was "regarded as" disabled under the ADA.

6

An individual is "regarded as" disabled under the ADA if a covered entity either mistakenly believes that the individual has a physical or mental impairment that substantially limits one or more major life activities, or mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *Id.* at 703 (citation and quotation marks omitted). The ADA defines major life activities to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Dr. Coursey makes no claim that UMES regarded him as substantially limited in one or more major life activities. Instead, he attempts to establish that he was "regarded as" disabled solely by virtue of UMES's request that he undergo a fitness for duty examination. "[A]n employer's request for a medical examination, standing alone, is not sufficient to establish that the employer 'regarded' the employee as disabled." *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 508-09 (3d Cir. 2001). Such a request, "taken in conjunction with other evidence or circumstances surrounding the request," however, may establish that the employer regarded the employee as disabled. *Id.* at 516.

In *Sullivan v. River Valley School District*, 197 F.3d 804, 808 (6th Cir. 1999), a teacher claimed that his employer regarded him as disabled and illegally suspended him without pay for refusing to submit to a mental and physical fitness for duty examination. After Sullivan began exhibiting "odd behavior" -- disclosing confidential information about a student, engaging in disruptive and abusive verbal outbursts at a school board meeting, and failing to report to meetings -- the school superintendent suspended Sullivan with pay and recommended to the school board that Sullivan undergo a fitness for duty examination out of concern that Sullivan

might be dangerous or mentally unstable. *Id.* at 808-09. Shortly thereafter, the school board adopted the superintendent's recommendation. *Id.* at 809. The court concluded

> [a] request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability because it does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities. Deteriorating performance may be linked to motivation or other reasons unrelated to disability, and even poor performance may not constitute a disability under the ADA.

*Id.* at 811.

As in *Sullivan*, Dr. Coursey began exhibiting erratic behavior that caused UMES administrators concern that he might pose a danger to students and staff. President Thompson removed Dr. Coursey from the classroom and requested that he undergo a fitness for duty examination before returning to work. Like Sullivan, aside from Thompson's request, Dr. Coursey has failed to offer any evidence that would suggest that UMES regarded him as disabled under the ADA. As the *Sullivan* court noted, "a defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Id.* at 810. Indeed, as the Fourth Circuit has observed,

> [t]he ADA is a shield against discrimination on the basis of disability; it is not a sword enabling employees who are not, in fact, substantially limited in any major life activity to refuse reasonable requests by their superiors for information and then plead their superiors' resulting lack of information as a "regarded-as" disability.

*Haulbrook*, 252 F.3d at 705. Because no reasonable trier of fact could conclude that UMES regarded Dr. Coursey as disabled within the meaning of the ADA, he cannot establish a prima facie case of wrongful discharge. As a result, the court will grant UMES's motion for summary judgment as to Dr. Coursey's ADA and Rehabilitation Act claims.

*Unlawful Request for Medical Examination*

Dr. Coursey also claims that UMES violated the ADA by demanding that he submit to a fitness for duty examination. The ADA prohibits an employer from requiring an employee to undergo a medical examination "unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The case law concerning this provision is "sparse"; however, "other Circuits have clarified what is required for a medical examination to be 'job-related and consistent with business necessity.'" *Blake v. Baltimore Cnty., Md.*, 662 F. Supp. 2d 417, 422 (D. Md. 2009) (citing *Conroy v. N.Y. State Dep't of Corr. Serv.*, 333 F.3d 88 (2d Cir. 2003); *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506 (3d Cir. 2001)), *aff'd*, 439 F. App'x 208 (4th Cir. 2011). For example, the Second Circuit has held that an employer must prove: "(i) 'that the asserted "business necessity" is vital to the business,' (ii) 'that the examination . . . genuinely serves the asserted business necessity,' and (iii) 'that the request is no broader or more intrusive than necessary.'" *Blake*, 662 F. Supp. 2d at 422 (quoting *Conroy*, 333 F.3d at 97-98). EEOC regulations also address this issue, stating that any examination ordered by an employer must be restricted to discovering whether an employee can continue to perform the essential functions of his or her job. *See* 29 C.F.R. Pt. 1630, App. § 1630.14(c) (offering interpretative guidance to § 1630.14(c)). While not controlling authority, this administrative interpretation of the ADA does represent "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

The Fourth Circuit has not decided whether an individual who is not disabled under the ADA can nevertheless bring a claim under section 12112(d). *See Pence v. Tenneco Auto. Operating Co., Inc.*, 169 F. App'x 808, 812 n. 5 (4th Cir. 2006). Even assuming that the ADA permits such a claim, UMES's requirement that Dr. Coursey undergo a fitness for duty

9

examination was permissible under the statute. The evidence surrounding UMES's request demonstrates that such an examination was consistent with business necessity, and Dr. Coursey has submitted no significant evidence of his own in rebuttal. Indeed, Dr. Coursey's abusive and erratic behavior toward students and staff gave UMES ample reason to seek further information about his ability to continue performing the essential functions of his employment. Campus safety is undoubtedly a core concern of any university, and taking steps to ensure it is "job related and consistent with business necessity." Accordingly, Dr. Coursey's claim that UMES violated the ADA by requiring him to undergo a fitness for duty examination must fail.

*Retaliation*

Dr. Coursey alleges that UMES unlawfully retaliated against him by terminating his employment after he filed a discrimination complaint with the EEOC. The ADA prohibits discrimination against any individual because he has opposed an unlawful act of disability discrimination or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing related to such discrimination. 42 U.S.C. § 12203(a) (1990). To establish a prima facie case of retaliatory discharge under the ADA, a plaintiff must show that: "(1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action." *Haulbrook*, 252 F.3d at 706. If a plaintiff satisfies this burden, the defendant must articulate a reasonable, nonretaliatory reason for his termination; if the defendant does so, the plaintiff must demonstrate that the proffered reason is a pretext for forbidden retaliation. *See id.*

UMES contends that Dr. Coursey failed to show a causal link between his October 2009 EEOC complaint and UMES's initiation of proceedings to terminate him in May 2010 because

10

too much time elapsed between the two events. Dr. Coursey counters that "temporal proximity alone cannot be used to justify a lack of causal connection between a protected complaint and an adverse employment action." (Pl.'s Opp., ECF No. 29, at 15.) Nonetheless Dr. Coursey fails to identify a single intervening instance of retaliatory conduct or animus that might suggest a causal link between his complaint and the initiation of termination proceedings. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650-51 (4th Cir. 2007) ("In cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.'") (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

Even assuming that Dr. Coursey has established a prima facie case of retaliation, UMES had a non-discriminatory, nonpretextual reason for terminating him. In recommending Dr. Coursey's termination, the Faculty Termination Board found Dr. Coursey had demonstrated incompetence and engaged in professional misconduct. The Board of Regents reiterated these findings, affirming President Thompson's decision to terminate Dr. Coursey. Because Dr. Coursey has not shown that UMES's reason for terminating him is pretextual, his claim of retaliation cannot succeed.

*Due Process*

Dr. Coursey also claims that UMES did not accord him sufficient procedural due process in connection with his dismissal. To establish a claim for relief for a violation of procedural due process, a plaintiff must show: "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (internal citation and quotation marks omitted). The minimum

procedural requirements for termination of a tenured public employee are "oral or written notice of the charges against [the employee], an explanation of the employer's evidence, and an opportunity [for the employee] to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

A tenured professor, Dr. Coursey was deprived of his property interest in continued employment at UMES when the university terminated him. *See Regents v. Roth*, 408 U.S. 574, 576-77 (1972). Nonetheless, Dr. Coursey has not demonstrated that the procedures UMES employed were constitutionally inadequate. After UMES gave Dr. Coursey notice that it had filed formal charges for termination, the university convened a hearing before a Faculty Termination Board composed of five faculty members. The Board met on nine non-sequential days, during which time it heard 47.5 hours of testimony from 19 witnesses and considered 129 exhibits. Dr. Coursey was represented by counsel during the hearing, and his attorney presented oral arguments. After the Board recommended his termination, he presented oral arguments to President Thompson before she made her decision. Dr. Coursey later appealed Thompson's decision before the Board of Regents, who, after hearing oral arguments, upheld Dr. Coursey's dismissal. Indeed, because it appears that Dr. Coursey received more due process rights than constitutionally required under the Fourteenth Amendment, his claim must fail. *See King v. Univ. of Minn.*, 774 F.2d 224, 228 (8th Cir. 1985) (characterizing a substantially similar evidentiary hearing and appeals process as providing "exhaustive procedural protections").[4]

*Breach of Contract*

---

[4] Dr. Coursey claims UMES denied him due process by "subjecting him to multiple hearings regarding the same events" (ECF No. 29, at 19); however, this argument lacks merit. As the Board of Regents observed, "[t]he second hearing was necessary to decide a different issue than was at issue in the first hearing." (ECF No. 28, Ex. 8, at 5.) The Board also noted that "[t]he evidence presented at the termination hearing was different from and much broader in scope" than the evidence presented at the May 2009 hearing. (*Id.*) In any event, Dr. Coursey has not provided any authority for the proposition that holding a second hearing on a different issue based on expanded evidence constitutes a due process violation.

Finally, Dr. Coursey argues that UMES breached its contract with him by terminating him without sufficient cause and without a hearing, and because his termination was based in part on insubordination. Under UMES and University policies, a tenured faculty member can only be terminated for "moral turpitude, professional or scholarly misconduct, incompetence, or willful neglect of duty." (ECF No. 28, Ex. 3.) While it is true that insubordination is not a separately enumerated basis for termination, the Faculty Grievance Board, President Thompson, a three-member panel of the University Board of Regents, and the full Board all found Dr. Coursey to have engaged in professional misconduct and to have been incompetent. Both are bases for termination covered under university policies. As noted above, UMES afforded Dr. Coursey a full evidentiary hearing and the right to appeal. Because UMES terminated Dr. Coursey in accordance with his contract, UMES is entitled to summary judgment on Dr. Coursey's breach of contract claim.

A separate Order follows.

April 30, 2013　　　　　　　　　　　　　　　　　　/s/
Date　　　　　　　　　　　　　　　　　　　　　　Catherine C. Blake
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge